**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RODOLFO G.,[1]** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 19 CV 3937** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey I. Cummings** |
| **KILOLO KIJAKAZI, Acting** | ) | |
| **Commissioner of Social Security,[2]** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Rodolfo G. ("Claimant") brings a motion for summary judgment to reverse or remand the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for period of disability and disability insurance benefits ("DIB"). The Commissioner brings a cross-motion seeking to uphold the denial. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §405(g). For the reasons that follow, Claimant's request for summary judgment (Dckt. #15) is denied and the Commissioner's motion for summary judgment (Dckt. #19) is granted. The decision of the Administrative Law Judge ("ALJ") is affirmed.

**I.  BACKGROUND**

**A.  Procedural History**

On June 6, 2016, Claimant (then 56-years old) filed his application for DIB, alleging disability beginning January 31, 2016 due to pain in both hands, high blood pressure, and a

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court refers to Claimant only by her first name and the first initial of her last name.

[2] Pursuant to Federal Rule of Civil Procedure 25(d), the Court has substituted Acting Commissioner of Social Security Kilolo Kijakazi as the named defendant.

stomach hernia.  (R. 89.)  Claimant's application was denied initially and upon reconsideration.

(R. 85-95.)  Claimant filed a timely request for a hearing, which was held on March 12, 2018

before an Administrative Law Judge ("ALJ").  Claimant appeared with counsel and offered

testimony through a Spanish interpreter.  (R. 13-39.)  A vocational expert also offered testimony.

On July 30, 2018, the ALJ issued a written decision denying Claimant's application for

benefits.  (R. 66-76.)  Claimant filed a timely request for review with the Appeals Council.  (R.

161-63.)  On April 8, 2019, the Appeals Council denied Claimant's request for review, leaving

the decision of the ALJ as the final decision of the Commissioner.  (R. 1-3.)  This action

followed.

### B.    The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled.

An individual does so by showing that he cannot "engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months."  42 U.S.C. §423(d)(1)(A).  Gainful activity is defined as "the kind of work

usually done for pay or profit, whether or not a profit is realized."  20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability

claims.  20 C.F.R. §404.1520.  The SSA first considers whether the claimant has engaged in

substantial gainful activity during the claimed period of disability.  20 C.F.R. §404.1520(a)(4)(i).

It then determines at step two whether the claimant's physical or mental impairment is severe

and meets the twelve-month duration requirement noted above.  20 C.F.R. §404.1520(a)(4)(ii).

At step three, the SSA compares the impairment or combination of impairments found at step

two to a list of impairments identified in the regulations ("the listings").  The specific criteria that

must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. §404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work. The SSA then determines at step four whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id*. If the claimant cannot undertake his past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. §404.1520(a)(4)(v).

### C. Claimant's Arguments for Remand

Claimant urges this Court to reverse and remand the ALJ's decision to deny him benefits, arguing that the ALJ: (1) made an improper RFC assessment when she rejected the opinion of his treating physician Dr. Rubinstein and failed to consider his subjective symptoms; and (2) erred in concluding that he could perform his past relevant work at step four. The Commissioner responds that substantial evidence supports the ALJ's RFC assessment, particularly given the dearth of medical evidence in the record. In addition, although the Commissioner concedes that the ALJ made an error at step four (Dckt. #20 at 2), it argues that any such error is harmless because the ALJ went on to make a proper determination at step five.

### D.    The Evidence Presented to the ALJ

Claimant seeks disability benefits for limitations stemming from hand pain, high blood pressure, and a stomach hernia.  The administrative record contains the following relevant evidence that bears on Claimant's claim:

### 1.    Evidence from Claimant's Treating Physicians

The medical records Claimant presented to the ALJ are sparse.  The earliest record is a chest CT from April 2011 ordered by Dr. Ariel Chavez.  (R. 256.)  The CT showed no evidence of acute cardiopulmonary process.  (*Id*.)

Additionally, the record includes handwritten, partially illegible treatment notes from Dr. Chavez dating back to 2013, which include various complaints and notations of, *inter alia*, "stable" hypertension, asthma, and tendonitis, some relevant to his disability application.  (R. 248-51, 301.)  For example, at a visit on November 30, 2013, Claimant complained of right-hand pain and tenderness, and Dr. Chavez appeared to assess arthritis and tendonitis and provide a depo-medrol steroid injection.  (R. 250.)  In September 2014, Dr. Chavez noted a growth in Claimant's abdomen.  (*Id*.)  A few months later in January 2015, Claimant complained of pain and numbness in his left hand and left lower leg.  (R. 249.)  Dr. Chavez noted tenderness in the left hand and again assessed tendonitis and prescribed Celebrex.  (*Id*.)  Claimant complained of pain in his left extremity and legs in late 2015.  (R. 248-29.)

The record also includes one treatment record (in letter format) and work status report dated December 2, 2015 from Dr. Scott Rubinstein.  (R. 307-09.)[3]  It appears Dr. Rubinstein

---

[3] Dr. Rubinstein's records were not available at the evidentiary hearing.  The ALJ acknowledged this fact and left the hearing record open so that Claimant's counsel could submit Dr. Rubinstein's records following the conclusion of the hearing.  (R. 16, 38.)  Claimant's counsel submitted only the December 2 note/status report from Dr. Rubinstein and counsel stated in writing that he "did not intend to further document" Claimant's application.  (R. 245.)

drafted the treatment note letter and status report following a December 2, 2015 office visit and submitted the same to Claimant's employer in connection with a worker's compensation claim. In his note, Dr. Rubinstein stated that Claimant had "been back to work light duty and doing reasonably well, but he has had a significant increase in his symptoms after being asked to use a vibrating type of tool such as a sawzall over the last few days." (R. 308.) Specifically, Claimant complained of numbness in his hands at night and exhibited positive Tinel's and Phalen's in both wrists. (*Id*.) Dr. Rubinstein assessed bilateral carpal tunnel syndrome and suggested that Claimant's continued use of vibrating tools over the years could have played a significant role. (R. 307-08.) Dr. Rubinstein recommended wrist braces for nighttime use. (*Id*.) Dr. Rubinstein also explained that Claimant "developed a trigger finger on his left ring finger" and gave him an injection. (*Id*.) Otherwise, Dr. Rubinstein described Claimant as neurologically intact. (*Id*.) He recommended that Claimant continue working with light duty restrictions (no lifting over 15 pounds) and no use of vibrating tools. (R. 307-08.)

In January 2016, Claimant returned to see Dr. Chavez and complained of pain in the umbilical area. (R. 248.) Dr. Chavez noted a growth and muscle separation, assessed an umbilical hernia, and referred Claimant to a surgeon. (R. 248, 251.)

On February 1, 2016, Claimant saw surgeon Dr. Mario Masrur for evaluation of the abdominal hernia and reported that he was diagnosed four years prior during a routine physical exam. (R. 274.) Though the hernia had increased in size, Claimant denied pain, nausea, or other gastrointestinal complaints. (*Id*.) Dr. Masrur discussed surgical options and scheduled Claimant for an "elective laparoscopic ventral and umbilical hernia repair." (*Id*.) Dr. Masrur performed the surgery on February 15, 2016 with no complications. (R. 276.)

Claimant presented to the emergency room on February 24, 2016 complaining of an adnominal rash, but no other complaints despite the recent surgery. (R. 265.) The rash was attributed to an allergic reaction to the bandages and Claimant was discharged without incident. (R. 265-71.) At a post-surgical follow up with Dr. Masrur on February 29, 2016, Claimant denied pain or gastrointestinal difficulty. (R. 283.) Apart from the allergic reaction to the bandages, he had no complaints. (*Id*.) Upon examination, Dr. Masrur noted that Claimant's surgical scars were healing well, there was no infection, and no hernia recurrence. (*Id*.) Dr. Masrur recommended six weeks of rest with no heavy lifting. (*Id*.)

Claimant followed up with Dr. Chavez in May 2016, at which point Dr. Chavez questioned whether Claimant potentially had an enlarged liver or mass. (R. 251.) Dr. Chavez referred Claimant for an abdominal ultrasound to investigate the possible soft tissue mass in the upper abdomen. (R. 251, 262.) However, the ultrasound was unremarkable and no soft tissue mass was identified. (R. 262.) At a few more check-ups with Dr. Chavez in late 2016 and in 2017, Claimant complained of a cough, shortness of breath, and on and off pain following his hernia surgery. (R. 301.)

### 2. Evidence from Agency Physicians

Claimant underwent a consultative examination on September 2, 2016, with Dr. Dante Pimentel. (R. 290-96.) Although Claimant's son came to the appointment to translate for Claimant, Dr. Pimentel noted that Claimant spoke "broken English." (R. 290.)

Claimant described a history of two trigger finger surgeries (two years prior and four years prior); abdominal hernia surgery in February 2016; and surgery for a right-hand fracture twenty years ago. (R. 290.) Claimant told Dr. Pimentel he previously underwent physical and occupational therapy. (*Id*.) Claimant complained of abdominal fullness and continued pain in

6

his right hand especially at the base of his right 4th finger, which he rated a seven out of ten.  (R. 290-91.)  Claimant was "independent with cooking, cleaning, and grooming," but stated that he "cannot grasp or hold things of any weight with his right hand because his finger locks up, which causes extreme pain.  (*Id*.)  Claimant told Dr. Pimentel that he worked in construction for 34 years and was "forced to retire, due to his finger injury."  (R. 291.)  At the time of the evaluation, Claimant was taking Bystolic and Azor (used to treat hypertension), and Dulera (used to treat asthma).  (*Id*.)

Upon physical exam, Dr. Pimentel noted a traction deformity at the base of the right 4th finger.  (R. 292.)  Claimant's motor strength was 5/5 in all extremities and the neurological exam yielded otherwise normal results.  (*Id*.)  Claimant could walk greater than fifty feet unassisted, with normal reciprocal gait and without assistive devices.  (*Id*.)  Claimant exhibited normal range of motion of the cervical spine, shoulders, elbows, wrists, hips, knees, and ankles bilaterally.  (R. 294-95.)  He had slightly reduced range of motion of the lumbar spine in the "flexion to floor" motion.  (R. 294.)  Claimant had mild difficulty squatting and arising and hopping on one leg.  (R. 295.)  As for fine and gross manipulative movements of the hands and fingers, Dr. Pimentel noted mild difficulty on the right dominant hand in tasks such as opening a door knob, squeezing a blood pressure cuff bulb, picking up small items, and handling buttons, zippers and shoe laces.  (R. 296.)  Claimant's grip strength was 5/5 on the left and 4/5 on the right.  (*Id*.)  A mental status exam was normal and Claimant "was able to produce sustained, audible, and understandable speech in English."  (R. 292.)

Dr. Pimentel assessed the following: (1) right 4th digit trigger finger, status post-surgical correction on two occasions, with traction deformity; (2) hypertension; (3) history of abdominal hernia, status post-surgical correction; (4) asthma; and (5) overweight.  (R. 292.)  Based on his

review of the records and examination, Dr. Pimentel determined that Claimant could sit, stand, and walk greater than 50 feet unassisted; hear, speak converse in broken English; was mildly impaired in his ability to lift, carry, handle objects, and carry out work-related activities due to his right hand injury and abdominal hernia. (R. 293.)

Upon Claimant's initial application, State agency physician Dr. Bitzer reviewed the record, including Dr. Pimentel's findings, and opined that Claimant could perform work at the medium exertional level with some further limitations. (R. 40-48.) Specifically, Dr. Bitzer concluded that Claimant could occasionally lift 50 pounds, frequently 25 pounds; could stand, walk and/or sit for six hours in an eight-hour day; could frequently climb ladders, ropes or scaffolds; and was limited to no more than frequent fine and gross manipulations with the right hand. (R. 44-46.) Dr. Bitzer based his findings on Claimant's history of hernia repair and trigger finger surgery. (*Id*.) At the reconsideration level, State agency physician Dr. Kim assessed the same limitations as Dr. Bitzer. (R. 50-59.)

### C. Evidence from Claimant's Testimony

Claimant appeared at the hearing before the ALJ with counsel and testified through an interpreter as follows. At the time of the hearing, Claimant was 59 years old and was residing with his wife and children. (R. 17.) He completed schooling in Mexico through the fourth grade and had no additional schooling after moving to the United States in about 1988. (R. 19-20.) Claimant is able to drive and has had a driver's license for about 25 years. (R. 18.) Claimant is right-handed. (R. 18.)

Claimant has been working consistently since moving to the United States. (R. 20.) From at least 2002 through 2016, Claimant worked for Brandenburg Industrial Service doing demolition work. (R. 22.) In that position, Claimant used a torch to cut through different kinds

of metals. (R. 23.) The torch was about three feet wide by six feet long and was attached with hoses to oxygen tanks. (*Id*.) This job involved a lot of standing and moving around and Claimant was required to lift the oxygen tanks, which weighed about 60-70 pounds. (R. 24.) Claimant testified that he cannot understand written English and understands only a little spoken English, so he received most of his instructions on the job for Brandenburg in Spanish. (R. 20.)

Claimant explained that over time, culminating in either 2014 or 2015, he suffered an injury to the tendon and ligaments of his right hand due to the repeated movements operating the torch, which required two surgeries.[4] (R. 25.) After his second surgery, Claimant returned to work with a 15-pound lifting restriction, so he performed lighter jobs such as sweeping, cleaning the trailer, and taking out the garbage. (R. 25-26.) He performed these lighter tasks until he retired from the Union after reaching the minimum retirement age. (R. 26.) According to Claimant, he also retired because he continued to have stomach pain after his hernia surgery in 2016. According to Claimant, however, no doctor told him he could not got back to work following the surgery, but rather he "made [his] decision to retire." (R. 27-28.) Claimant also explained that pain in his legs and knees – which his doctors attributed to arthritis – prevent him from working, though he testified he has no problem standing or walking. (R. 27-28, 30.) Prescription pain pills provide minimal relief. (R. 28.) Claimant has suffered from asthma for "a long time," which he tries to keep under control with an inhaler. (R. 28-29.)

Upon further questioning from his attorney, Claimant testified that after two surgeries, he continues to have trouble with his ring finger, which often locks up causing pain and difficulty grasping and lifting. (R. 29-30.) His finger stays locked unless he "physically unlock[s] it." (*Id*.) Claimant testified that Dr. Rubinstein told him that "it doesn't make sense" to have any

---

[4] Claimant filed a worker's compensation claim based on his injury and received a settlement from the company in 2016. (R. 19, 193-94.)

additional surgeries because he would be "worse off." (R. 31.) Claimant further explained that when he returned to light work following his initial surgery, he attempted to hold the broom and do his jobs in a way that would prevent further injury. (R. 31-32.) And, although he explained that dust and fumes sometimes aggravate his asthma, he did not have difficulty breathing while working at Brandenburg because he wore a respirator. (R. 32-33.)

### D.    Evidence from Vocational Expert's Testimony

A vocational expert ("VE") also appeared and offered testimony at the hearing. The VE first classified Claimant's two positions at Brandenburg under the Dictionary of Occupational Titles ("DOT"), explaining that he worked primarily as a union thermal cutter, which is heavy and skilled as defined by the DOT and as performed by Claimant. (R. 33-34.) The VE classified Claimant's position following his surgeries as a construction worker, which is very heavy and unskilled under the DOT, but light as performed by Claimant. (R. 34.)

Next the ALJ asked the VE to consider a hypothetical individual of Claimant's age, education, and work experience, who could perform medium work, but was limited to frequent climbing of ladders, ropes, or scaffolds, frequent fingering and handling with the right dominant hand, and was not fluent in English. (R. 34.) When asked if such an individual could perform Claimant's past work, the VE testified that he could only perform the Claimant's past light work, not the heavy-duty construction work. (*Id*.) However, such an individual could perform other work in the national economy including in the medium, unskilled positions of assembler, packager, and cleaner. (R. 34-35.) If the hypothetical individual was further limited to light work, he could again only perform the light duty construction past job that Claimant performed, but not as defined by the DOT. (R. 35.) Similarly, if the individual could not use vibrating tools

and could only lift 15 pounds, he could only work in Claimant's past light duty construction job. (R. 35-36.)

Lastly, the ALJ asked the VE whether the hypothetical individual could perform Claimant's past work or any other work if he were further limited to only occasional handling and fingering on the right side. (R. 36.) The VE explained that the individual could not perform Claimant's past work or any other positions at either the medium or light exertional levels because the jobs that would allow only occasional use of the dominant hand would require communicating in English. (R. 36-37.)

Upon questioning by Claimant's counsel, the VE agreed that Claimant's return to light work following his hand surgery would be considered an accommodation. (R. 37.) The VE also confirmed that Claimant had no transferable skills. (*Id.*)

## II. THE ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ applied the five-step inquiry required by the Act in reaching her decision to deny Claimant's request for benefits. At step one, the ALJ found that Claimant had engaged in some substantial gainful activity in 2016. (R. 69.) However, the ALJ found that at least after April 1, 2016, there had been a continuous 12-month period during which Claimant did not engage in substantial gainful activity and thus proceeded with the analysis. (*Id.*) Next, at step two, the ALJ determined that Claimant suffered from the following severe impairments: hernias, tenosynovitis of the right ring finger, status post trigger surgery, and carpal tunnel syndrome. (R. 69-70.) The ALJ acknowledged that the record also included evidence of hypertension and asthma, but found these impairments non-severe because there was no evidence they had more than a minimal impact on Claimant's ability to perform work related activities. (*Id.*) At step three, the ALJ concluded that Claimant did not have an impairment or combination of

impairments that met or medically equaled one of the Commissioner's listed impairments, including listing 1.02 (major dysfunction of a joint).  (R. 70.)

The ALJ went on to assess Claimant's RFC, ultimately concluding that he had the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c),[5] except he can "frequently climb ladders, ropes, or scaffolds, and handling and fingering on the right is limited to frequent."  (R. 70.)  He also noted that Claimant is not fluent in English.  (R. 70-74.)  Based on this RFC, the ALJ determined that Claimant could perform his past relevant work as a construction worker as performed following the hernia surgery.  (R. 74-75.)  Alternatively, the ALJ made a step five determination, finding that there are other jobs in the national economy Claimant could perform based on his age, work experience, and RFC, including the representative positions of assembler, packer, and cleaner.  (R. 75.)  As such, the ALJ found that Claimant was not under a disability from the application date through the date of the decision.  (R. 76.)

## III.    STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court.  Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Karr v. Saul,* 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted).  The Commissioner's decision must also be based on the proper legal criteria and free

---

[5] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. §404.1567(c).

from legal error. *Scheck v. Barnhart,* 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, by making independent symptom evaluations, or by otherwise substituting its judgment for that of the Commissioner. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## IV.    ANALYSIS

### A.    The ALJ's RFC Assessment Is Supported By Substantial Evidence And Free From Legal Error

The crux of Claimant's first arguments boils down to whether the ALJ properly concluded that Claimant had the RFC to perform medium work, with some additional limitations. Again, "[t]he RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); *Murphy v. Colvin,* 759 F.3d 811, 817 (7th Cir. 2014). The task of assessing a claimant's RFC is reserved to the Commissioner. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). "In determining what a claimant can do despite his limitations, the [ALJ] must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own

statement of what he or she is able or unable to do." *Id.*; *Murphy,* 759 F.3d at 818. Such evidence includes the claimant's medical history; the effects of treatments that he or she has undergone; medical source statements; effects of the claimant's symptoms; the reports of activities of daily living ("ADL"); lay evidence; and evidence from attempts to work. Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *5 (July 2, 1996). In formulating the RFC, "[t]he ALJ has the responsibility of resolving any conflicts between the medical evidence and the claimant's testimony." *Pepper v. Colvin,* 712 F.3d 351, 807 (7th Cir. 2014).

For the reasons that follow, the Court finds that the ALJ's RFC assessment here is supported by substantial evidence.

### 1. The ALJ Properly Considered The Opinion Of Claimant's Treating Physician Dr. Rubinstein

As discussed above, Dr. Rubinstein – in his treatment note and work status report dated December 2, 2015 – listed some of Claimant's symptoms and signs (hand numbness, triggering, and positive Tinel and Phalen's) and indicated that he gave Claimant an injection and recommended wrist braces. Dr. Rubinstein then opined that Claimant could continue working but should be limited to lifting no more than fifteen pounds and must avoid the use of vibrating tools. (R. 307-09.) The ALJ reviewed Dr. Rubinstein's opinion but gave it "little weight." (R. 73.) For the following reasons, the Court finds no reversible error in the ALJ's weighing of Dr. Rubinstein's opinion.

Under the treating physician rule applicable to this case, the ALJ must give a treating source's opinion controlling weight "if it is well-supported and not inconsistent with other substantial evidence."[6] *Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016); *Karr,* 989 F.3d at

---

[6] For claims filed on or after March 27, 2017, the treating physician rule has been modified to eliminate the controlling weight instruction. *Kaminski v. Berryhill*, 894 F.3d 870, 876 (7th Cir. 2018), *amended on reh'g* (Aug. 30, 2018).

511; *see also* 20 C.F.R. §404.1527(c). "Once well-supported contrary evidence is introduced, however, a treating physician's opinion becomes just another piece of evidence for the ALJ to evaluate." *Karr,* 989 F.3d at 511.

An ALJ must offer "good reasons" for not giving controlling weight to a treating physician's opinion after considering the "length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R. §404.1527(c). While "an inadequate evaluation of a treating physician's opinion requires remand," *Cullinan v. Berryhill*, 878 F.3d 598, 605 (7th Cir. 2017), courts will uphold "all but the most patently erroneous reasons for discounting a treating physician's assessment." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (citing *Luster v. Astrue*, 358 Fed.Appx. 738, 740 (7th Cir. 2010)). The Seventh Circuit has also made it clear that an ALJ's failure to expressly analyze a treating physician's opinion under the multi-factor framework contained in 20 C.F.R. §404.1527(c)(2) will not result in reversal if the court is convinced that "the ALJ would reach the same result on remand" if the proper framework is applied. *Karr,* 989 F.3d at 512-13.

In this case, the ALJ has provided sufficient reasons for rejecting Dr. Rubinstein's opinion after implicitly considering the factors enumerated in 20 C.F.R. §404.1527(c) to the extent it was possible based on the record before her.[7] *See Schreiber v. Colvin*, 519 Fed.Appx. 951, 959 (7th Cir. 2013) (upholding opinion despite ALJ not "explicitly" considering each factor where the "decision makes clear that the [ALJ] was aware of and considered many of the factors…"); *Ray v. Saul*, 861 Fed.Appx. 102, 105-06 (7th Cir. 2021) ("[W]e we will affirm the

---

[7] As noted below, the record contains insufficient information as to several of the factors specified by the regulation.

ALJ's decision if we are confident that the ALJ's reasoning sufficiently accounted for the substance of the prescribed factors.").

First, the ALJ discounted Dr. Rubinstein's opinion because he offered it *prior* to Claimant's alleged onset date and thus he "does not, and indeed could not, address the condition of the claimant since the alleged onset date and to the present." (R. 73.) Of course, the ALJ cannot ignore evidence simply because it pre-dates a claimant's onset date and must consider the record as a whole. *See* 20 C.F.R. §404.1520(a)(3) ("We will consider all evidence in your case record when we make a determination or decision whether you are disabled."); *see also Johnson v. Sullivan*, 915 F.2d 1575 (7th Cir. 1990) (noting that the "ALJ should consider the record as a whole, including pre-onset evidence…and post-onset evidence."). But the ALJ did not ignore Dr. Rubinstein's report here; instead, she properly "examined it as required" and "continued with additional reasons why she was discounting" the opinion. *See Eichstadt v. Astrue*, 534 F.3d 663, 667 (7th Cir. 2008) (finding no error when ALJ did not "refuse to consider" a report but rather concluded that it failed to support the claimant's claim).

In particular, the ALJ went on to consider the "consistency and supportability" of Dr. Rubinstein's opinion that Claimant required a 15-pound lifting restriction and could not use vibrating tools by noting that "subsequent consultative exam findings suggest that the claimant was capable of greater exertional activity and there are no recent treatment records to support continued adherence to Dr. Rubinstein's restrictions." (R. 73.) Those subsequent findings include Dr. Pimentel's opinion that claimant was only "mildly" limited in his ability to lift, carry and handle objects, and the reviewing State agency physicians' findings that Claimant could perform medium work with certain limitations, all of which the ALJ considered and incorporated

into the RFC assessment.[8]  The ALJ was free to discount Dr. Rubinstein's opinion given that it was inconsistent with other record evidence, including the opinions of state agency physicians. *See Peeters v. Saul*, 975 F.3d 639, 641-42 (7th Cir. 2020); *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019); 20 C.F.R. §404.1527(c)(2).

Lastly, and perhaps most importantly, Claimant – who bears the burden of documenting his claim – failed to submit any additional treatment records from Dr. Rubinstein apart from the single treatment note and worker's compensation status report from December 2, 2015.  *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability."). ‼ Again, and as the ALJ explicitly discussed in her opinion, she left the record open following the hearing so that Claimant could submit records from Dr. Rubinstein.  Although Claimant subsequently submitted the December 2 documents (a total of three pages), he did not present any additional treatment records from Dr. Rubinstein to provide further support for his opinion. Instead, his lawyer stated in writing to the ALJ that he did not intend to document the claim further and asked that a decision be rendered.  (R. 245.)

---

[8] Throughout his briefs, Claimant attempts to undermine the opinions of the State agency physicians, which the ALJ afforded "great weight."  However, "[t]he Seventh Circuit has held that an ALJ may rely on opinions from State agency physicians when they are consistent with the record."  *Mary Ann R. v. Saul*, No. 18 C 1368, 2019 WL 4645445, at *6 (N.D.Ill. Sept. 24, 2019) (citing *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("It is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation.")).  Here, Claimant has not presented any convincing argument as to why the State physicians' opinions are not consistent with the record.  Instead, Claimant argues that they rendered their opinions without the benefit of reviewing Dr. Rubinstein's opinion and his carpal tunnel diagnosis.  Having otherwise determined that the ALJ properly discounted Dr. Rubinstein's opinion and considered Claimant's carpal tunnel diagnosis in formulating Claimant's RFC (*infra*, at Section IV(A)(2)), the Court finds no reversible error in the ALJ's weighing of the physicians' opinions.  *See, e.g., Young,* 362 F.3d at 1001 ("Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do").

The failure to present additional records regarding Dr. Rubenstein's treatment of Claimant left the ALJ unable to further assess the length, nature, and extent of the treatment relationship between Claimant and Dr. Rubinstein, the frequency of examination, and the types of tests performed (if any) beyond that one specific visit.[9] Even the nature of Dr. Rubinstein's area of expertise is not specified beyond the fact that he is affiliated with the Illinois Bone and Joint Institute. (R. 308-09.) It is well settled that a treating physician's opinion "must be 'well-supported by medically acceptable clinical and laboratory diagnostic techniques.'" *Lloyd v. Berryhill,* 682 Fed.Appx. 491, 496 (7th Cir. 2017), *quoting* 20 C.F.R. §404.1527(c). Dr. Rubinstein's opinion lacked such support here and, for all of the above reasons, the ALJ offered sufficient reasons for affording it little weight.

### 2. The ALJ Adequately Account For Claimant's Bilateral Carpal Tunnel Diagnosis When Formulating His RFC

As pointed out above, the ALJ determined that Claimant's tenosynovitis of the right ring finger, status post trigger finger surgery, and bilateral carpal tunnel diagnosis were severe impairments. (R. 69.) Claimant asserts that the ALJ failed to adequately account for his bilateral carpal tunnel in formulating his RFC. The Court disagrees. In formulating Claimant's RFC, the ALJ had a duty to evaluate all relevant evidence, including evidence of impairments (whether severe or not), and the court will "an ALJ's decision if the evidence supports the decision and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review." *Arnett v. Astrue,* 676 F.3d 586, 591-92 (7th Cir. 2012); *Brisco ex rel. Taylor v.*

---

[9] Claimant seeks to have the Court to infer that Dr. Rubinstein treated Claimant at least since February 2015 because Dr. Rubinstein indicated on the December 2015 status report that the lifting limitation had been in effect since February 13, 2015. (Dckt. #15 at 11.) However, there are no contemporaneous treatment records from February 13, 2015 in the record. Consequently, there is no way to know whether it was Dr. Rubinstein or some other healthcare provider who initially put the lifting limit in place. There is also no documentation as to the reason that the limitation was imposed in the first place.

*Barnhart,* 425 F.3d 345, 352 (7th Cir. 2005) ("RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts") (internal quotation marks omitted).

In this case, the ALJ explicitly discussed and accounted for Claimant's bilateral carpal tunnel and trigger finger syndrome when formulating his RFC. (R. 72.) The ALJ cited to the medical evidence from Drs. Rubenstein and Pimentel as well as to Claimant's own statements regarding his ability to use his right dominant hand and provided a narrative explanation as to how this evidence supported the RFC and did *not* support more restrictive limitations. (R. 71-72.) Although Claimant disagrees with the RFC and believes that it should be more restrictive, the Court finds the ALJ considered the relevant evidence regarding Claimant's impairments and weighed that evidence to determine the RFC with enough detail and clarity to permit meaningful review. This is sufficient (*Arnett,* 676 F.3d at 591-92; *Briscoe,* 425 F.3d at 352), and there is no basis for remand based upon how the ALJ assessed Claimant's bilateral carpal tunnel in formulating his RFC.

### 3. The ALJ Properly Considered Claimant's Subjective Symptoms When Formulating His RFC

Claimant also argues that the ALJ failed to properly consider his subjective symptoms – in particular, his claims that he has pain in his legs and has difficulty being on his feet – when fashioning his RFC. (Dckt. #15 at 10.) It is true that the ALJ must sufficiently explain her evaluation of a claimant's subjective symptoms "by discussing specific reasons supported by the record." *Pepper*, 712 F.3d at 367. Moreover, the ALJ's discussion must allow a reviewing Court "to determine whether [the ALJ] reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *McKinzey*, 641 F.3d at 890. The Court will only overturn the ALJ's subjective symptom assessment if it is "patently wrong." *Elder*, 529

F.3d at 413. "Patently wrong is a high threshold – 'only when the ALJ's determination lacks any explanation or support . . . will [we] declare it to be 'patently wrong' and deserving of reversal.'" *Ray,* 861 Fed.Appx. at 107, *quoting Elder,* 529 F.3d at 413-14; *Wilder v. Kijakazi,* 22 F.4th 644, 653 (7th Cir. 2022).

Social Security Ruling ("SSR") 16-3p provides additional guidance to the ALJ for assessing the Claimant's symptoms.[10] SSR 16-3p calls for a two-step process whereby the ALJ first determines whether the claimant has a medically determinable impairment that could reasonably be expected to produce her symptoms. SSR 16-3p, 2017 WL 4790249, *49463; *Wilder,* 22 F.4th at 654. Next, the ALJ must evaluate the "intensity, persistence, and functionally limiting effects of the individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 16-3p, 2017 WL 4790249, *49464; *Wilder,* 22 F.4th at 654. In making this evaluation, the ALJ should consider the entire case record, along with (1) the claimant's daily activities; (2) location, duration, frequency, and intensity of pain or symptoms; (3) precipitation and aggravating factors; (4) type, dosage and side effects of medication; (5) treatment other than medication; and (6) any other factors concerning the claimant's functional limitations and restrictions. SSR 16-3p, 2017 WL 4790249, *49465-66; 20 C.F.R. §416.929.

---

[10] Because the ALJ issued her ruling after March 28, 2016, SSR 16-3p, which superseded SSR 96-7p, applies here. *See* SSR 16-3p, 2017 WL 4790249, n.27. SSR 16-3p shifted the focus from a claimant's credibility to clarify that "subjective symptom evaluation is not an examination of the individual's character" but instead entails a careful application of "regulatory language regarding symptom evaluation." *Id.* at 49463; *see also Cole v. Colvin,* 831 F.3d 411, 412 (7th Cir. 2016) (noting that ALJs are not "in the business of impeaching claimants' character"). Nonetheless, SSR 96-7p and SSR 16-3p "are not patently inconsistent with one another," and a "comparison of the two Rulings shows substantial consistency, both in the two-step process to be followed and in the factors to be considered in determining the intensity and persistence of a party's symptoms." *Shered v. Berryhill*, No. 16 CV 50382, 2018 WL 1993393, at *5 (N.D.Ill. Apr. 27, 2018).

The ALJ followed this two-step analysis here, first determining that Claimant's impairments could reasonably be expected to cause the alleged symptoms. But, at the second step, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of those symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 71.) Those reasons are sufficient to allow the Court to conclude that the ALJ reached her decision in a rational manner supported by substantial evidence in the record. *McKinzey*, 641 F.3d at 890.

First, the ALJ expressly recognized Claimant's testimony that he experienced pain in his knees and legs but she did not incorporate these symptoms into the RFC based upon Claimant's acknowledgment that he had no problems standing, walking, or sitting. (R. 71, 30.) This was not error.

Next, in reviewing the medical records, the ALJ commented on the lack of objective evidence supporting Claimant's other subjective complaints. For example, the ALJ noted that Claimant had few complaints of abdominal pain following his hernia surgery; no objective evidence to support his statement that he could lift no more than fifteen pounds (apart from Dr. Rubinstein's opinion which she properly discounted); and no objective evidence of problems with his hands following the September 2016 consultative exam. (R. 71-72.) Claimant is correct that an ALJ may not discount a claimant's symptom statements *solely* because they are not substantiated by objective evidence. SSR 16-3p, 2017 WL 4790249, *49465. However, a "lack of objective support from physical examinations and test results" remains relevant to the ALJ's assessment. *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014). Here, the treatment record as a whole, including Claimant's minimal contemporaneous complaints to his treating physicians, supports the ALJ's subjective symptom analysis. *See, e.g., Jens v. Barnhart,* 347

F.3d 209, 212-13 (7th Cir. 2003) (rejecting claimant's assertion that the ALJ erred by failing to find that his inability to concentrate rendered him unable to perform his past relevant work where the record showed that claimant did not complain of concentration problems to his treating physician).

Beyond the objective medical evidence, the ALJ also considered other factors enumerated in SSR 16-3p. For example, the ALJ took into account Claimant's minimal treatment history, which did not include evidence of physical or occupational therapy or injections beyond the one provided at the December 2 visit with Dr. Rubinstein. "[T]he Seventh Circuit has held that it is reasonable for an ALJ to consider a claimant's conservative treatment." *Anthony G. v. Saul*, 2020 WL 439964, at *10 (N.D.Ill. Jan. 28, 2020) (citing *Simila v. Astrue,* 573 F.3d 503, 519 (7th Cir. 2009) (upholding finding based in part on "relatively conservative" treatment)).

Although the Claimant faults the ALJ for failing to consider the reasons for such minimal treatment, the ALJ *did* consider Claimant's testimony that his doctors told him further surgeries could not correct his locking finger. *See Araceli D. v. Saul*, No. 19 C 3487, 2021 WL 392698, at *5 (N.D.Ill. Feb. 4, 2021) ("Though a history of sporadic treatment can undermine a claimant's credibility…an ALJ must consider the claimant's reasons for the lack of care before drawing a negative inference."). Accordingly, the Court finds no reversible error in the ALJ's conclusion that Claimant's minimal treatment history "in combination with the relatively mild consultative exam findings, suggest that the claimant's symptoms were not as severe as he alleged." *See Ray*, 861 Fed.Appx. at 107 ("Because the ALJ's weighing of [claimant's] reported symptoms in the context of the whole record is supported by substantial evidence, we find no reversible error").

In sum, for all of these reasons, the ALJ's subjective symptom analysis, while perhaps not perfect, was not "patently wrong."  *See Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, at *10 (N.D.Ill. Apr. 10, 2014) (citing *Schreiber v. Colvin,* 519 Fed.Appx. 951, 961 (7th Cir. 2013) ("The ALJ's credibility assessment need not be perfect; it just can't be patently wrong.")).  !

**B.      The ALJ's Error At Step Four Is Harmless And Does Not Require Remand Because The ALJ Performed An Appropriate Analysis At Step Five**

Finally, Claimant argues that the ALJ erred at step four when she found Claimant could perform his past relevant work as a construction worker (very heavy under the DOT) without properly considering that Claimant most recently performed that job at a very light level due to accommodations from his employer.  *See* 20 C.F.R. §404.1573(c) ("If your work is done under special conditions, [the agency] may find that it does not show that you have the ability to do substantial gainful activity.").  However, any such error in this regard is harmless where, as here, the ALJ continued to step five and made a finding, supported by the VE's testimony, that Claimant could perform other jobs in the national economy such as assembler, packer, and cleaner.  *See Guranovich v. Astrue*, 465 Fed.Appx. 541, 543 (7th Cir. 2012) ("Because the ALJ's decision would be the same under this alternative RFC at step five, any error at step four was harmless."); *Ziegler v. Astrue*, 336 Fed.Appx. 563, 570–71 (7th Cir. 2009) (finding any error at step four "immaterial" so long as the Court upholds the ALJ's alternative finding at step five); *Jill A. v. Kijakazi*, No. 20 C 3854, 2022 WL 225879, at *12 (N.D.Ill. Jan. 26, 2022) (same).

Of course, under such circumstances the Claimant remains free to attack the step five finding but, as the Commissioner points out, Claimant's attempts to do so here amount simply to a rehashing of the RFC-related arguments already discussed at length above.  *See* Dckt. #15 at 12 ("[T]he ALJ's Step Five finding that [Claimant] could perform other work in the national

economy is not supported by substantial evidence in light of her erroneous RFC assessment."). At the end of the day, "it is for the ALJ to weigh the evidence and to make judgments about which evidence is most persuasive." *Bruce P. v. Saul*, No. 18 CV 7478, 2020 WL 7042888, at *14 (N.D.Ill. Dec. 1, 2020) (citing *Farrell v. Sullivan*, 878 F.2d 985, 989 (7th Cir. 1989)). The ALJ has provided sufficient reasoning for her judgments that are grounded in substantial evidence in the record.

## CONCLUSION

For the foregoing reasons, Claimant's request for summary judgment (Dckt. #15) is denied and the Commissioner's motion for summary judgment (Dckt. #19) is granted. The decision of the ALJ is affirmed.

ENTERED: **February 18, 2022**

**Jeffrey I. Cummings**
**United States Magistrate Judge**